AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Delaware

United States of America
v.
Joshua Henry

*Defendant(s)*

Case No. 25-200M

REDACTED

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   March 2025 - April 2025   in the county of   Kent   in the
_____ District of   Delaware  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1) | possession of a firearm or ammunition by a prohibited person |
| 18 U.S.C §§ 933(a)(1) | trafficking in firearms |

This criminal complaint is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

Received
APR 24 2025

*Complainant's signature*
TFO Michael Macauley, FBI
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed R. Crim. P.4.1 and 4(d).

Date: 04/24/2025

*Judge's signature*

City and state: Wilmington, DE

Hon. Laura D. Hatcher, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Macauley, a Delaware State Trooper who is a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of a Criminal Complaint for of **JOSHUA HENRY** ("**HENRY**") charging 18 U.S.C. §§ 922(g)(1) (possession of a firearm or ammunition by a prohibited person), and 18 U.S.C §§ 933(a)(1) (trafficking in firearms) (the "**TARGET OFFENSES**").

2. I am a duly sworn Detective of the Delaware State Police ("DSP"), who is a deputized TFO with the FBI. I am an "investigative or law enforcement officer" of the United States, within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been a Delaware State Trooper since March 2013. I attended the Delaware State Police Academy in Dover, Delaware, and I have attended additional formal trainings related to drug, gang, and criminal enterprise investigations. I have received on-the-job training in the provisions of the Federal Laws administered under Title 18 and Title 21 of the United States Code. Prior to my employment with DSP, I was employed for approximately two (2) years as a Police Officer with the Wildwood, New Jersey, Police Department, and Voorhees Township, New Jersey, Police Department as a part-time law enforcement officer. I have had previous federal deputizations with the Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), and the United States Marshalls Service ("USMS") in reference to federal criminal investigations.

3. Since May 5, 2024, I have been assigned to the FBI Violent Crimes Task Force in Delaware. I have been responsible for investigating drug, violent crime, and criminal enterprise

offenses. Through my assignments with DSP, I have been assigned to the DSP Governor's Task Force ("GTF") and DSP Drug Unit ("DTF"), where I conducted similar investigations. During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, sale of firearms, the laundering of drug proceeds, and the organization of drug conspiracies. Through my training and experience, I have become familiar with the manner in which illegal drugs and firearms are transported, stored, and distributed, and with the method of payment for such drugs or firearms.

4. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

5. The facts in this affidavit come from my personal observations, my review of financial and other records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that sufficient probable cause for a criminal complaint and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### *Overview*

6. Based on the information contained herein, there is probable cause to believe that **HENRY** committed the **TARGET OFFENSES**.

7. The United States, including the FBI, as well as DSP, is conducting a criminal investigation of **HENRY** regarding possible violations of the **TARGET OFFENSES**. There is probable cause to believe **HENRY** used           , Smyrna, Kent County, Delaware, 19977 ("**TARGET LOCATION 1**");           , Kent County, Delaware, 19977

("TARGET LOCATION 2"); and                    ., Frederica, Kent County, Delaware, 19946 ("TARGET LOCTION 3") (collectively, the "TARGET LOCATIONS") and a black 2019 Acura MDX bearing Delaware registration PC448523 ("TARGET VEHICLE 1") and a black 2020 Kia Optima bearing Delaware registration 586417 ("TARGET VEHICLE 2") (collectively, the "TARGET VEHICLES") to further those offenses. More specifically, **HENRY** used the **TARGET LOCATIONS** and the **TARGET VEHICLES** to engage in the trafficking of firearms, as follows:

  a. On March 13, 2025, after communicating with an undercover State Trooper ("UC") using his cell phone, **HENRY** drove in **TARGET VEHICLE 1** from **TARGET LOCATION 1** to **TARGET LOCATION 2**, and then drove to a third location where he sold a firearm to UC;

  b. On April 2, 2025, after using his cell phone to arrange another firearm transaction with UC, **HENRY** drove **TARGET VEHICLE 1** to **TARGET LOCATION 1** and then to **TARGET LOCATION 2**, where he then loaded an item in **TARGET VEHICLE 2** before failing to complete the controlled purchase due to what he described as "domestic issues";

  c. On April 16, 2025, after using his cell phone to arrange another firearm transaction with UC, **HENRY** drove in **TARGET VEHICLE 2** from **TARGET LOCATION 3** to a different location where he sold a firearm to UC;

  d. On April 22, 2025, after using this cell phone to arrange another firearm transaction with UC, **HENRY** drove in **TARGET VEHICLE 1** from **TARGET LOCATION 2** to **TARGET LOCATION 1** and then to a nearby location where he stole $700

from UC before getting back into **TARGET VEHICLE 1** and fleeing the scene; and

 e. Finally, **HENRY**, during recorded phone conversations with the UC, offered to commit acts of violence, such as robbery and murder, on the behalf of the UC.

### *Criminal History of HENRY*

8. A criminal history search for **HENRY** shows at least the following felony convictions:

 a. Convicted on August 23, 2011, in the Delaware Kent County Superior Court of Escape After Conviction.

 b. Convicted on November 24, 2009, in the Delaware Kent County Superior Court of Robbery 2nd Degree.

 c. Convicted on April 4, 2005, in the Delaware Kent County Superior Court of Theft Greater than $1000.00 Dollars.

9. Based on these convictions, **HENRY** is ineligible to possess, sell, or manufacture firearms pursuant to federal law.

### *First Undercover Purchase of a Firearm*

10. During the month of March 2025, the UC contacted **HENRY** via recorded communications. During their communications, **HENRY** showed UC several firearms, including a semi-automatic-style magazine-fed "shotgun" that he claimed to have for sale. **HENRY** agreed to sell the "shotgun" to UC in exchange for an agreed-upon amount of United States Currency.

11. On March 13, 2025, UC and Person-1 met **HENRY** at the agreed-upon meet location of _____, Smyrna, Delaware. Prior to the meet, law enforcement observed

**HENRY** leaving from **TARGET LOCATION 1** in a 2019 black Acura MDX bearing Delaware registration PC448523 (i.e., **TARGET VEHICLE 1**).

12.  After leaving **TARGET LOCATION 1,** law enforcement observed **HENRY** drive to **TARGET LOCATION 2**. Law enforcement then observed **HENRY** drive **TARGET VEHICLE 1** directly to to meet UC and Person-1. During the meet, UC completed a purchase of a GForce Arms GFY-1 "Bullpup"-style magazine-fed shotgun chambered in 12 GA (Serial #2168645) loaded with a black magazine containing 10 Super X slug rounds of ammunition from **HENRY** for $600.00 dollars. During the transaction, **HENRY** stated he had further firearms for sale and showed UC an additional semi-automatic style handgun for sale.

*HENRY Begins Utilizing the TARGET VEHICLE 2 and Staying at TARGET LOCATION 3*

13.  During the week of March 31, 2025, UC contacted **HENRY** via the **TARGET TELEPHONE**. During recorded conversations on the **TARGET TELEPHONE**, **HENRY** conversed with UC about the firearms he had for sale and relayed he could sell two Glock-style handguns that had fully automatic conversion switches, which your affiant knows meets the definition of a "machinegun" pursuant to 18 U.S.C. § 922(o). **HENRY** agreed to meet with and sell UC the two firearms on April 2, 2025.

14.  On April 2, 2025, the deal between **HENRY** and the UC was not consummated. After April 2, 2025, **HENRY** also contacted UC via the **TARGET TELEPHONE** and informed him that he had "domestic issues," which is why he could not meet UC to make the sale on April 2, 2025.

*Undercover Purchase of Semi-automatic Handgun from HENRY*

15.  During the week of April 14, 2025, **HENRY** contacted UC from the **TARGET**

**TELEPHONE** and relayed he had a .380 handgun for sale. During the recorded conversations, UC agreed to purchase the .380 handgun from **HENRY** in exchange for United States Currency on April 16, 2025.

16. On April 16, 2025, prior to the sale, investigators conducted surveillance of **LOCATION 3, HENRY,** and **TARGET VEHICLE 2.** Law enforcement observed **TARGET VEHICLE 2** parked in the driveway of **TARGET LOCATION 3.** At that same time, law enforcement observed that location data1 for the **TARGET TELEPHONE** showed the **TARGET TELEPHONE** at **TARGET LOCATION 3.**

17. Prior to the sale, UC contacted **HENRY** via the **TARGET TELEPHONE**. **HENRY** agreed to meet UC at a parking lot located at                  ., Frederica, Delaware.

18. Law enforcement then observed **HENRY** leave **TARGET LOCATION 3** and enter the driver seat of **TARGET VEHICLE 2. HENRY** then drove **TARGET VEHICLE 2** directly to the prearranged meet location at              , where UC was already waiting.

19. On arrival, **HENRY** exited the **TARGET VEHICLE 2** and got into the front right passenger seat of UC's vehicle. **HENRY** and UC conversed briefly in which UC relayed that he needed the firearm to commit acts of violence.

20. More specifically, **HENRY** responded that he would assist UC, if needed, to commit murder or other acts of violence.

| | |
|---|---|
| **JH:** | But, uh, bro, bro man, if you need me, man, me and my folks will come straight down that motherf***er and tear s*** down. |
| **UC:** | Word? |

---

[1] On March 26, 2025, DSP received authorization, via State of Delaware search warrants, to install a GPS tracking device on **TARGET VEHICLE 1**, to collect records and location data of the **TARGET TELEPHONE** and obtain historical cell tower information for the **TARGET TELEPHONE**.

| | |
|---|---|
| JH: | What? For the right price, n****? We'll tear s*** down, n****. |
| UC: | How, how much you talking about? |
| JH: | Uh, well depends on what you want done man. |
| UC: | S***, I just want him hit. You get what I'm saying? Like |
| JH: | Yeah, well |
| UC: | I wanna make sure he is done. |
| JH: | I mean, my young boy charged 35 for that. But you never seen him again ever. |
| UC: | Yeah, yeah, yeah, yeah, yeah. |
| JH: | But you know what I mean? He probably want a thousand up front, you know what I mean? He just get him out the way he send you the picture and you know you CashApp him the rest but he went a thousand cash. |
| UC: | Yeah. |
| JH: | And the rest you can cash app him. But it gotta be anonymous though. |
| UC: | Oh yeah. Oh s***. We can, yeah, we can, we can do that. Yeah, we can do that. |
| JH: | But you still need that for you though, of course, because it's small. Yeah. I mean you got the small clip where you can conceal it, but you got the extendo clip on it too. |
| UC: | Yeah. |

21. It is your affiant's opinion, based on training, experience, and the totality of the investigation, that **HENRY** offered to commit an act of violence for the UC ("*me and my folks will come straight down that motherf***er and tear s*** down.*") **HENRY** also offered to have a conspirator commit a murder for $3,500 ("*my young boy charged 35 for that. But you never seen him again ever.*"), take a photo of the dead body ("*He just get him out the way he send you the picture and you know you CashApp him the rest but he went a thousand cash*"), and then anonymously send money through CashApp for the murder ("*And the rest you can CashApp him. But it gotta be anonymous though.*")

22. Below is a photo of **HENRY** meeting inside UC's vehicle:



23. The two completed an exchange in which UC provided **HENRY** with official pre-recorded government funds and **HENRY** provided UC with a Ruger LCP black semi-automatic handgun (SN# 372142776) with 2 magazines (1 extended) and 5 rounds of .380 ball ammunition. Below is a photo of **HENRY** accepting the money from the UC:



24. After the transaction, **HENRY** exited UC's vehicle and reentered **TARGET VEHICLE 2's** driver seat and departed the area.

### *Additional Conversations between HENRY and UC*

25. On April 16, 2025, **HENRY** contacted UC via the **TARGET TELEPHONE**. During the recorded call, **HENRY** explained that the .380 Ruger would work and explained how

effective he believed the firearm was or should be. **HENRY** also advised that he had just spoken to his "boy" from whom he could obtain an assault rifle pistol-style firearm for $600.00. **HENRY** stated he already had one but was willing to get UC this firearm for $600.00. **HENRY** also explained he had a couple of firearms at his residence that he wanted to keep, including a Glock firearm. **HENRY** also stated that UC could use the .380 Ruger firearm to murder someone and how it could easily be discarded after being used:

| | |
|---|---|
| JH: | Yeah. And that's what I do. You know what I mean? I keep the, you know what I mean, see me, me, I keep the Glock on me, you know what I mean? I got a Glock 17, I keep on me at all times. The gen three, I keep that on me. |
| UC: | Yeah, yeah, yeah. |
| JH: | But I got the big s*** at the crib, you feel me? The AR-P, nah mean. I got a couple joints at the crib. |
| UC: | Yeah, yeah, that's, see, like, that's what I need because like now I got this, I can just like keep that on me. |
| JH: | Exactly. Because yo, that b**** is so small, you can put it in your coat, bro. |
| UC: | Yeah, yeah. Well |
| JH: | That b****'s perfect, bro. |
| UC: | Yeah. Especially now in summertime. Like, bro, |
| JH: | That's a perfect hitter. Yeah, I'm telling it's a perfect hitter, bro. |
| UC: | Yeah, yeah. Like that, that's exactly … |
| JH: | Listen. But, but I mean, I know, I ain't gonna tell you man, but you know, when you hit it hit, you know what I mean? Wear, wear some gloves so you can just throw it. |
| UC: | Oh, of course. |
| JH: | Yeah. You know what I mean? You know what I mean doing, you know what I mean? Just throw that motherf***er, bro, because that's what it is, a throwaway, you feel |
| UC: | Me? Bro. That's all it is. Like, that's why, that's why I was telling you, man, like, like when I, when I shoot this dude, bro, like that's, I'm, that's why my dude, I'm, I'm gonna throw this motherf***er, |
| JH: | Throw that motherf***er, bro. Show that b**** hard as you can. |

26. Later in the conversation, **HENRY** asked details about who UC specifically was looking to murder and why. UC provided details that a subject pointed a gun at him/her during a

drug transaction for cocaine. **HENRY** then offered to set up this subject with UC to rob him. **HENRY** discussed cocaine with UC and stated he could get UC in contact with his "blood brother" who sells cocaine for $600.00 dollars an ounce. **HENRY** stated that he could provide UC with cocaine as well if he/she needed a quantity of cocaine to start.

27.     On April 18, 2025, UC again was contacted by **HENRY** via the **TARGET TELEPHONE**. **HENRY** relayed that he arranged for UC to acquire the assault rifle pistol-style firearm from his friend. **HENRY** advised he would get it for UC and provide same to him/her in the upcoming week.

### *Attempted Undercover Purchase of the AR pistol-style Firearm with HENRY*

28.     On April 21, 2025, UC, after keeping contact with **HENRY** via the **TARGET TELEHONE**, arranged to meet **HENRY** to purchase an AR pistol-style firearm for $700.00 from **HENRY**.

29.     On April 22, 2025, **HENRY** directed UC to meet him in the area of **TARGET LOCATION 1**. UC arrived in the area of **TARGET LOCATION 1**, at which time **HENRY** was observed out on foot in the area of **TARGET LOCATION 1**. **HENRY** then entered yje UC's vehicle, and the two drove to the nearby area of Talon Court, where UC parked his/her vehicle.

30.     While meeting with **HENRY**, UC spoke about purchasing the firearm. **HENRY** agreed to get UC the firearm but explained he needed to go someplace else—outside the vehicle— to get the forearm. **HENRY** requested the $700.00 dollars prior to going to get the firearm.

31.     In exchange, **HENRY** left UC with a brown wallet that contained **HENRY's** social security card, a card for an Artisans' Bank, two American Traffic flagger certified safety cards both with Joshua D. Henry written as the certified person, a Big Lots Rewards card, and two $10.00

dollars bills (pictured below). HENRY provided this to UC as apparent collateral for UC to return to him when HENRY returned with the firearm. However, HENRY exited UC's vehicle and ran away, headed back toward the direction of TARGET LOCATION 1.



32. Once back in the area of TARGET LOCATION 1, surveillance units observed HENRY get into TARGET VEHICLE 1 and depart the area. After a prolonged period, during which HENRY did not respond to UC's attempts to contact him using the TARGET TELEPHONE, surveillance was discontinued. It was also observed that TARGET TELEPHONE appeared to be shut off momentarily by HENRY after he did not return to UC

with the firearm to complete the transaction.

## CONCLUSION

33.     Based on your affiant's training and experience, your affiant submits that there is probable cause to believe that **HENRY** committed the **TARGET OFFENSES**.

34.     Based on the facts set forth in this affidavit, there is probable cause to believe that **JOSHUA HENRY** committed the **TARGET OFFENSES**, 18 U.S.C. §§ 922(g)(1) (possession of a firearm or ammunition by a prohibited person), and 18 U.S.C §§ 933(a)(1) (trafficking in firearms). Therefore, I respectfully request that the court issue a Criminal Complaint.

Respectfully submitted,

*TFO Michael Macauley*
Michael Macauley
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to telephonically
in accordance with Fed. R. Crim. P. 4.1
before me on April 24, 2025.

*Laura D. Hatcher*
The Honorable Laura D. Hatcher
United States Magistrate Judge